```
              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - -x
                                  :
UNITED STATES OF AMERICA          : No. 3:11CR-223(SRU)
                                  : 915 Lafayette Boulevard
                                  : Bridgeport, Connecticut
        vs.                       :
                                  : June 22, 2012
STEVEN FINKLER                    :
                                  :
- - - - - - - - - - - - - - - - -x


                   MOTION HEARING


B E F O R E:

    THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.


A P P E A R A N C E S:


    FOR THE GOVERNMENT:

         OFFICE OF THE UNITED STATES ATTORNEY
            915 Lafayette Boulevard,  Room 309
            Bridgeport,  Connecticut 06604
         BY:  RAHUL KALE, AUSA


    FOR THE DEFENDANT:

         FEDERAL PUBLIC DEFENDER'S OFFICE
            10 Columbus Blvd., 6th FL
            Hartford, Connecticut   06106
         BY:  RONALD B. RESETARITS, AFPD



                Susan E. Catucci, RMR
                 Official Court Reporter
                 915 Lafayette Boulevard
              Bridgeport, Connecticut  06604
                   Tel: (917)703-0761
```

```
 1                    (4:40 O'CLOCK, P. M.)
 2              THE COURT:  Good afternoon.  We're here in the
 3    matter of United States v. Steven Finkler.  Could I have
 4    appearances please?
 5              MR. KALE:  Rahul Kale for the United States.  I
 6    apologize for being late.  With me at counsel table is
 7    Steven Lambert from the probation office.
 8              THE COURT:  Thank you.
 9              MR. RESITARITS:  Good afternoon.  Ron
10    Resitarits, for Mr. Finkler.
11              THE COURT:  Very good.  Thank you.  And we're
12    here on the question of the violation of supervised
13    release.  Where do things stand with respect to state
14    court proceedings?
15              MR. RESITARITS:  Your Honor, all of those
16    matters are still pending.
17              Do you know when the court date --
18              THE DEFENDANT:  I don't know.
19              MR. RESITARITS:  Your Honor, I didn't check the
20    state web site in terms of his next court date, but I have
21    been in touch with his state defense attorney.
22              What I would propose today, and I've spoken to
23    Probation Officer Lambert and Attorney Kale, we have a
24    proposed package or plan for release, and I would prefer
25    not to deal with the, with the merits of the supervised
```

```
 1    release violation today.  I would ask that we come back on
 2    that and hopefully I'll be able to continue to work with
 3    the state defense attorney.
 4              And it's somewhat difficult in the sense that I
 5    think that the state court is waiting for us to do
 6    something and we're waiting for them to do something, but
 7    somebody has to make a move.  But in the meantime I think
 8    with home confinement -- my client's wife is here, Sarah
 9    Finkler, as is his aunt, Dana in the back -- home
10    confinement, electronic monitoring, cosigning of the bond.
11    I believe that's satisfactory to the government, Your
12    Honor.
13              THE COURT:  Cosigning what amount of bond by
14    whom?
15              MR. RESITARITS:  Signed by Mr. Finkler, cosigned
16    by his wife Sarah Finkler, and his aunt, Dana Sigal (ph).
17              THE COURT:  And in what amount are you
18    suggesting for a bond?
19              MR. RESITARITS:  I leave that up to the Court's
20    discretion and probation's discretion.  50,000-dollars,
21    Your Honor?
22              THE COURT:  Mr. Lambert, Mr. Kale, any comment?
23              MR. LAMBERT:  Your Honor, while, you know, I did
24    talk with Mr. Resitarits, we did talk about that, I just
25    wanted to note to the Court that previously Mr. Finkler's
```

1  conduct on electronic monitoring has been poor.  I would
2  ask that he be on 24 hour lock-down because all these
3  cases that he caught in the state were while he was on
4  electronic monitoring.  We allowed him out to look for
5  work, to go to work and he was catching cases every month,
6  so if he is allowed to be on electronic monitoring we ask
7  that he be on 24 hour lock-down to keep him out of
8  trouble.  I know that I, about two months ago I spoke with
9  a detective out of Torrington, and seeing him out and
10 about would really be setting him up because they still
11 have cases that they are still looking at, so I wouldn't
12 want to set him up to fail.
13          THE COURT:  Mr. Kale, anything?
14          MR. KALE:  Your Honor, we would defer to
15 probation for reasons -- I'm not sure -- may we approach
16 for a moment, Your Honor?
17          THE COURT:  Okay.  Do you want to be on the
18 record or off?
19          MR. KALE:  Off the record briefly, Your Honor.
20          (Off the record discussion.)
21          THE COURT:  All right.  Do either of you want to
22 be heard?  Anybody want to be heard further?
23          MR. RESITARITS:  No, Your Honor.
24          MR. KALE:  Nothing from the government, Your
25 Honor.

1      THE COURT:  All right.  Well, let me just say
2 this.  I have serious concerns about releasing Mr. Finkler
3 at this point.  What I've got is a long list of claimed
4 violations, an apparent inability to comply with any type
5 of supervision.  And I'm not confident frankly that
6 Mr. Finkler is going to be able to succeed if he were
7 released.
8      I think electronic monitoring of home
9 confinement has been proven ineffective and I think that
10 the only way that he would be allowed to be released is if
11 he had GPS monitoring, so that there's not any doubt about
12 where he is when what he's doing.
13      Mr. Finkler, that is a much greater limitation
14 on your privacy.  We're going to know at any given moment
15 where you are within 2 feet, which means if somebody
16 claims that you walked into their premises and you defraud
17 them in some way or you did XYZ, we're going to have
18 electronic information to prove that in fact that was you
19 who walked in there.  Do you understand what I'm saying?
20      THE DEFENDANT:  Yes, Your Honor.
21      THE COURT:  Do you understand that if you were
22 released, it can be to your great advantage because you're
23 going to prove that you're able to comply with what
24 Mr. Lambert expects of you as somebody he's supervising,
25 or it can be to your great detriment because if you're not

```
 1    going to be able to do that, I'm going have a thicker
 2    bunch of documents suggesting that you ought to go to jail
 3    longer as a result of violations.  Do you understand the
 4    choice you've got?
 5             THE DEFENDANT:  Yes.
 6             THE COURT:  What does that mean for you?
 7             THE DEFENDANT:  To comply with all the Court's
 8    orders.
 9             THE COURT:  Right.  And do you understand what
10    you're supposed to be doing?
11             THE DEFENDANT:  Yes.
12             THE COURT:  Are you going to be able to work
13    with Mr. Lambert and be someone he can actually supervise
14    or are you going to be somebody off doing more of this
15    alleged unlawful conduct?
16             THE DEFENDANT:  I'm going to abide by all the
17    regulations that the Court sets and Mr. Lambert sets.
18             THE COURT:  Are you able to -- I mean I'm not
19    sure how much GPS monitoring is.  What does it cost?
20             MR. LAMBERT:  I'm not certain, Your Honor.
21             THE COURT:  I think it's a few dollars a day.
22             MR. LAMBERT:  Yes.
23             THE COURT:  I mean it's like six, seven, maybe
24    more dollars a day.  Can you afford that?
25             THE DEFENDANT:  Yes.
```

1               (Defendant conferring with Counsel)
2               THE COURT:  Do your wife and aunt understand
3      that they stand to lose money if you violate the terms of
4      your bond?  They are going to lose 50,000-dollars; do they
5      understand that?
6               THE DEFENDANT:  Yes, Your Honor.
7               THE COURT:  Let's get them up here because I
8      want something on the record from anybody cosigning this
9      bond.  Mr. Finkler does not have a great track record and
10     I want anybody cosigning this bond to understand the
11     potential financial impact of signing a bond, that if he
12     violates it, subjects the cosigner to liability.
13              MR. RESITARITS:  This is Dana Siegal and Sarah
14     Finkler, Your Honor.
15              THE COURT:  All right.
16              MR. RESITARITS:  Come up to the podium, Your
17     Honor?
18              THE COURT:  Right there.  I want to hear them
19     explain to me that they understand the consequences that
20     face them if they sign a bond for Mr. Finkler's release
21     and he violates his terms and fails to show up, fails to
22     do what he's supposed to do, breaks the law.  The
23     consequences for the cosigners of that bond is you lose
24     50,000-dollars.  Do you understand that?
25              You need to speak.

```
1                MS. FINKLER:  Yes, I understand.
2                MS. SIEGAL:  Yeah.
3                THE COURT:  Ms. Siegal, Mr. Resitarits was able
4    to explain to you the consequences of Mr. Finkler
5    violating a bond condition?  Did he --
6                MS. SIEGAL:  I understand.
7                THE COURT:  Did he tell you that if Mr. Finkler,
8    if he you cosigned a bond and Mr. Finkler violates the
9    conditions, that the government can ask you to, demand of
10   you to pay 50,000-dollars, do you understand that?
11               MS. SIEGAL:  Uh huh.  (Affirmative.)  Can I talk
12   to him a minute?
13               THE COURT:  Excuse me?
14               MS. SIEGAL:  Could I talk to Steven a minute?
15               MS. FINKLER:  Could I, too?
16               THE COURT:  Yeah, sure.
17               (Pause)
18               THE COURT:  All right?  I think your wife wanted
19   to talk to you as well.
20               (Pause)
21               THE COURT:  Let me ask each of you whether
22   you're prepared to sign the bond.
23               MS. SIEGAL:  Yes.
24               MS. FINKLER:  (Nodding in the affirmative.)
25               THE COURT:  All right, thank you.
```

1            All right, I will reluctantly order Mr. Finkler
2    released on a 50,000-dollar nonsurety bond cosigned both
3    by his wife and by his aunt, Dana Siegal.  All of the
4    current conditions of -- well, the former conditions of
5    supervised release remain in effect and I'm going to add
6    that Mr. Finkler be on home confinement monitored by GPS.
7    He pays the cost of the GPS.
8            And let's now figure out the time, appropriate
9    hours of confinement and appropriate reasons not to be in
10   the home, if any.
11           (Pause)
12           MR. KALE:  I think, Your Honor, I think release
13   should only be allowed if he's going to see probation or
14   to see -- or to go to his law enforcement appointments
15   within the state -- or not law enforcement but I guess his
16   state court appointments, and then to see his lawyer
17   obviously.
18           THE COURT:  I would add medical, if he needs to
19   attend medical appointments.
20           MR. RESITARITS:  Your Honor, would you also add
21   religious observances?
22           THE COURT:  I was just about to ask.
23           MR. RESITARITS:  I just asked him.  He does go
24   to Temple on Saturdays.
25           THE COURT:  Okay.  All right, I will allow that

1   but I think we need to be clear in advance with
2   Mr. Lambert, to be fair to Mr. Lambert, he has to know
3   what service you're going to --
4           THE DEFENDANT:  Okay.
5           THE COURT:  -- in advance.  You can't just be --
6   you know, he sees an alert showing up that you're out of
7   the house and then you call him three days later and say,
8   oh, I went to services.  It has to be I'm going to the ten
9   o'clock Saturday service every week or I'm not going to go
10  or -- you see what I'm saying?
11          THE DEFENDANT:  Yes, sir.
12          THE COURT:  Has to be scheduled and clear.  It
13  can't just be something you use that is an excuse for
14  being out of the house.  Understand?
15          THE DEFENDANT:  Understood.
16          THE COURT:  Same with medical appointments.
17  Don't go to your doctor or don't get an alert on the GPS
18  and say, "Oh, well, I wasn't feeling well, I went to the
19  doctor."  No, no.  Your first call is to Mr. Lambert,
20  every time; otherwise we've got a problem again.  Do you
21  understand?
22          THE DEFENDANT:  Yes.
23          THE COURT:  So don't even think about going out
24  of the house unless you are telling him in advance,
25  "Mr. Lambert, I'm leaving the house at 2:30 because we

1   have an appointment to see each other at 3:00 o'clock.
2   You told me to be at the probation office, I'm going to
3   tell you in advance, at 2:30, I'm going to drive straight
4   to probation, and then drive straight home." Or "On
5   Wednesday at ten o'clock, is it okay if I go visit my
6   lawyer? It's going to take an hour and-a-half."
7              I mean don't leave anything to chance. Do you
8   understand what happens if you leave things to chance?
9              THE DEFENDANT: Yes, Your Honor.
10             THE COURT: You're going to be back here again,
11  I'll be revoking your bond and I'll be turning to your
12  wife and your aunt saying bring your checkbook. That's
13  what we're talking about. And obviously it looks really
14  bad if I let you out and then you start doing anything
15  wrong. Do you understand?
16             THE DEFENDANT: Yes, Judge.
17             THE COURT: It's not worth it. Trust me, I do
18  not want to be made a fool. Clear?
19             THE DEFENDANT: Understood.
20             THE COURT: All right. Let me hear from counsel
21  about what documentation is necessary to effect the order
22  that I just described. Mr. Finkler was on supervised
23  release. He was then, he was then in essence detained.
24  It seems to me that we need an order modifying the prior
25  conditions of supervised release, or we need a bond

1  signed.  Do we need anything else?

2          MR. RESITARITS:  Conditions of release.

3          THE COURT:  Well, the conditions -- that's a

4  good question.  Do I need to fill out a conditions of

5  release or are we simply reinstating the prior conditions

6  of release modified to add the GPS condition and modified

7  to add the bond condition?

8          MR. RESITARITS:  Your Honor, were there

9  conditions of release?  Because he was on supervised

10 release, there's a petition of violation, he's arrested --

11 well, he's arrested in state court.  There's a petition

12 for violation.  He's detained.  I don't think there were

13 any conditions of release.  They would be modifying the

14 conditions of --

15         THE COURT:  Supervised release.  That's what I'm

16 saying, that what we need is an order modifying the

17 conditions of supervised release.

18         MR. KALE:  I think that makes sense, Your Honor.

19         THE COURT:  Everybody agree with that?

20         MR. RESITARITS:  Yes.  What I don't know is if

21 we need both.

22         THE COURT:  You think we do?  I don't think we

23 do.  Do you think we do?

24         MR. RESITARITS:  I don't know, I've never had

25 this situation, but whether the bond plus modifying the

1  conditions of supervised release is enough, I don't know.
2  I haven't had this situation, but --
3              THE COURT:  Well, I'll be clear.  I want the
4  full ability to send Mr. Finkler to prison in the event
5  that he violates these conditions of supervised release.
6  I have a three year sentence potentially available, so if
7  he doesn't call Mr. Lambert when he's supposed to and he's
8  outside the house, he's facing three years in prison.
9              MR. RESITARITS:  Yes.
10             THE COURT:  I don't want there to be any
11 question about that.  So I want to do an order modifying
12 the conditions of supervised release to add the bond and
13 add home confinement with electronic monitoring, and I
14 think that does it.
15             MR. KALE:  Yes, sir.
16             THE COURT:  Anybody -- Mr. Lambert, do you have
17 a concern about that?
18             MR. LAMBERT:  No, Your Honor.
19             THE COURT:  All right.  All right, let's --
20 Mr. Resitarits, do you have a problem with that?
21             MR. RESITARITS:  No, Your Honor.
22             THE COURT:  All right, let's do that.  So I'm
23 going to orally order, and we'll prepare, with the
24 assistance of probation and the government, an order that
25 accomplishes that, modifying the conditions of supervised

```
 1   release, adds the bond condition, adds the home
 2   confinement with electronic monitoring, and that will be
 3   pending further order.  And hopefully we'll be back here
 4   soon on the merits of the violation hearing and we'll take
 5   it up.
 6            MR. RESITARITS:  Thank you.
 7            THE DEFENDANT:  Thank you.
 8            THE COURT:  Is everybody comfortable with that?
 9            MR. KALE:  Yes, Your Honor.
10            MR. RESITARITS:  Yes.
11            THE COURT:  So, I'm going to orally order that
12   at this time.  We'll get a written order, as I said,
13   modifying it and the bond can be completed after we recess
14   today.
15            Okay.  Anything further we need to take up at
16   this time?
17            MR. RESITARITS:  No, Your Honor.
18            MR. KALE:  No, Your Honor.
19            THE COURT:  Just to be clear, Mr. Finkler is
20   currently in federal custody, is that right?
21            THE DEFENDANT:  That is correct, Your Honor.
22            MR. RESITARITS:  That is correct.
23            THE COURT:  So I'll order him released following
24   processing pursuant to this order.
25            MR. RESITARITS:  Yes.
```

```
 1              THE COURT:  Anything else?  All right.
 2              MR. KALE:  No, Your Honor.
 3              THE COURT:  All right, thank you all.  We'll
 4     stand in recess.
 5              (Pause.)
 6              THE COURT:  I just had an off the record
 7     conversation with Mr. Lambert and it occurs to me there's
 8     one potential problem and that's this:
 9              A GPS unit may not be available until early next
10     week.  So, Mr. Finkler, you are not permitted -- you're
11     going to be released today to home confinement.  You are
12     not permitted to leave your house for any reason until you
13     get that GPS unit on, is that clear?
14              THE DEFENDANT:  Yes, Your Honor.
15              THE COURT:  All right.  So I hope there's
16     somebody sitting outside your door watching, because if
17     you leave, it's all over.  Do you understand?
18              MS. FINKLER:  One question.  Like if a neighbor
19     says come and get some cake or cupcakes, he can't walk --
20              THE COURT:  He cannot, no.
21              MS. FINKLER:  I know it sounds crazy but it
22     happens.  Can he go to the patio?
23              THE COURT:  To the patio?
24              MS. FINKLER:  We live in a condo.  Can he walk
25     outside --
```

1        THE COURT:  You mean like a balcony?

2        THE DEFENDANT:  No, it's just one floor.

3        MR. RESITARITS:  It's directly behind your home?

4        THE DEFENDANT:  Will it go off?

5        THE COURT:  You'll have to work with
6   Mr. Lambert.  I believe that it will go off, and I believe
7   that's a problem.  The idea is this is supposed to be a
8   little bit like prison.  All right?  In prison you can't
9   go out on the patio, and with home confinement you can't
10  go out on the patio.

11       MS. FINKLER:  Okay.

12       THE COURT:  I just want you to be clear, yes, so
13  there's no concerns in the house, in the residence.

14       MS. FINKLER:  One more question.  The home
15  thing, the monitoring system, sometimes when a call comes
16  in, it starts going -- I guess I should talk to you about
17  if it starts beeping.

18       MR. LAMBERT:  Entirely different.

19       THE COURT:  A GPS is different than a phone
20  line.

21       MS. FINKLER:  Okay.

22       THE COURT:  GPS is like when a cell phone can
23  tell where you are, take the next right or whatever.

24       MS. FINKLER:  I get it.

25       THE COURT:  The GPS is going to tell probation

1    where he is within about 2 feet.  They wouldn't tell maybe
2    which table he's at but they know he's at a table, so if
3    he goes out on the patio, they know he's on the patio.
4            MR. RESITARITS:  What if there's a fire,
5    anything -- I'm just saying if something happens.
6            THE COURT:  Something better not happen.
7            MR. KALE:  You can talk to Mr. Lambert.
8            THE COURT:  These are completely accurate.  If
9    something happens, it happens for a reason.  So there's
10   no, there's no wiggle room on a GPS.  All right?  Got it?
11           THE DEFENDANT:  Yes, Your Honor.
12           THE COURT:  All right, good luck.
13           We'll stand adjourned at this point.  Thank you
14   all.
15           (Whereupon the above matter was adjourned at 5:05
16   o'clock, p. m.)

C E R T I F I C A T E

     I, Susan E. Catucci, RMR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

     /S/ Susan E. Catucci
     _____

     Susan E. Catucci, RMR
     Official Court Reporter
     915 Lafayette Boulevard
   Bridgeport, Connecticut  06604
      Tel: (917) 703-0761